UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SINGHAL & COMPANY, INC.,

 Plaintiff

v.              CIVIL NO. JKB-19-01209

VERSATECH, INC.,

 Defendant

## MEMORANDUM

Singhal & Company, Inc. ("SCI") filed suit against Defendant VersaTech, Inc. alleging breaches of contract and promissory estoppel. SCI seeks actual damages, disgorgement of all profits received by VersaTech as a result of deliberate breaches, prejudgment interest on all amounts, and costs and reasonable attorneys' fees. Versatech filed a motion to dismiss, and the matter is fully briefed. No hearing is required. *See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, VersaTech's motion to dismiss will be granted in part and denied in part.

*I. Background*[1]

SCI is a company which provides a variety of technology services to government and private clients. (Compl. ¶ 6, ECF No. 1.) SCI entered into a contract to perform work on the United States Food and Drug Administration's White Oak Campus to provide "audio/visual and information technology support services." (*Id.* ¶ 9.) When SCI entered into the contract, it qualified as a small disadvantaged business under the government's 8(a) Business Development program, 13 C.F.R. § 124.1 *et seq.* (*Id.*) When it was time for the FDA to re-bid the contract, SCI

---

[1] The facts in this section are taken from the Complaint and construed in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

1

no longer qualified under the 8(a) program. (*Id.* ¶ 11.) SCI partnered with another 8(a) business, VersaTech, to help it prepare its proposal for the White Oak project "on the understanding that if VersaTech was awarded the contract, SCI would bring its experience and employees to bear on the project and would receive a commensurate workshare." (*Id.*)

VersaTech was awarded the contract and subsequently entered into a subcontractor agreement (the "subcontract") with SCI on January 20, 2017. (*Id.* ¶ 12.) Under the subcontract, VersaTech issued task orders to SCI with statements of work to be done, and SCI was paid pursuant to rates established in the subcontract. (*Id.* ¶¶ 13–14.)

In July 2017, Jason Peay, the CEO of VersaTech, contacted SCI to ask if SCI could reduce its labor rates by 7%. (*Id.* ¶ 18.) Vineet Singhal, the CEO and Principal of SCI, wrote back that he would agree to reduce the labor rates by 7% if VersaTech would 1) give SCI 49% of the workshare, and 2) source all project materials through SCI. (*Id.* ¶ 19.) In his email, Mr. Singhal also wrote, "[w]e will do a contract mod with revised labor pricing and this work share for our managers to implement." (*Id.* Exh. B at 5.) Mr. Peay responded, "I've spoken to my team and we are good with moving forward with the plan below. Vivian will begin the process of setting up new subK's." (*Id.* Exh. B at 2.) Hernan Rodas, an SCI employee, then forwarded the email exchange to VersaTech employee Omar Silver. (*Id.* Exh. B at 2.) In his email, Mr. Rohas wrote:

> Vineet and Jason have discussed and have agreed on a 51/49 set up with 7% VT mark up on the IDIQ LCAT rates and 10% mark up on implementation materials for the life of the contract. This is what was finalized per Jason's confirmation and we will begin to implement this new set up to all task orders. We will use this for requirements moving forward and will start re-balancing exercise for all task orders.

(*Id.* Exh. B at 1.) Mr. Silver responded, "I confirmed the assumption of the agreement yesterday. I hope you are comfortable with the assumptions as well. I have added Lee to this email because it will be Lee that implements, tracks and monitors this new agreement." (*Id.* Exh. B at 1.)

2

Following this email exchange, SCI "signed task order modifications that reduced SCI's rates by the agreed upon 7%," and all subsequent work done for VersaTech reflected that rate reduction. (*Id.* ¶ 25.) SCI alleges that while it reduced its rates by the agreed 7%, VersaTech did not allocate 49% of the workshare to SCI or source all its materials through SCI. (*Id.* ¶¶ 37–38.)

In addition, SCI alleges VersaTech breached the subcontract by unreasonably withholding consent to SCI's use of a subcontractor, Vision Technologies ("Vision"). (*Id.* ¶¶ 28, 58.) Pursuant to § 22.2 of the subcontract, SCI "shall not subcontract or assign this Agreement, or otherwise dispose of any of its right, title, or interest herein to any third-party, without obtaining the prior written consent of VersaTech, which will not be unreasonably withheld . . ." (*Id.* Exh. A.) SCI admits it did not seek prior written consent to use Vision, but states that VersaTech was aware SCI was using Vision as a subcontractor and withheld its consent unreasonably and in bad faith. (*Id.* ¶¶ 29, 58.)

Finally, SCI claims that VersaTech breached the subcontract by failing to pay SCI's invoices on time. (*Id.* ¶ 39.) The subcontract requires that VersaTech pay SCI "within seven (7) days after VersaTech receives payment for such services performed by [SCI] from the Customer pursuant to the Contract or within sixty (60) days after submission of a valid invoice, whichever is earlier." (*Id.* Exh. A § 2.3.) SCI states that at least $90,850.83 is overdue and claims that VersaTech began paying SCI's invoices late after SCI rejected an offer from VersaTech to buy SCI's assets. (*Id.* ¶¶ 39–40.)

## II.   *Legal Standard*

VersaTech filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (Mot. Dismiss. at 1, ECF No. 12.) A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. An inference of "the mere possibility of misconduct" is not sufficient to support a plausible claim. *Id.* at 679. Courts must "accept the well-pled allegations of the complaint as true, . . . constru[ing] the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra*, 120 F.3d at 474. "A pleading that offers 'labels and conclusions' or . . . 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Iqbal*, 556 U.S. at 678 (alteration in original) (citation omitted) (quoting *Twombly*, 550 U.S. at 555, 557). Courts need not accept legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555.

### III. Analysis

#### A. Breach of Contract (Count I, III, IV)

A breach of contract claim requires 1) a "contractual obligation," 2) "breach," and 3) "damages." *Kumar v. Dhanda*, 17 A.3d 744, 749 (Md. Ct. Spec. App. 2011), *aff'd*, 43 A.3d 1029 (Md. 2012). Under Maryland law, the duty of good faith and fair dealing is implied in every contract, but violation of this duty does not constitute a separate cause of action. *Swedish Civil Aviation Admin. v. Project Mgmt. Enters.*, 190 F. Supp. 2d 785, 793–94 (D. Md. 2002) (finding that a claim for breach of the duty of good faith and fair dealing is no different than a contract claim). Maryland law requires courts to interpret contracts objectively. *Cochran v. Norkunas*, 919 A.2d 700, 709 (Md. 2007). "A court must 'give effect to the contract's plain meaning, without regard to what the parties to the contract thought it meant or intended it to mean.'" *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005) (quoting *Turner v. Turner*, 809 A.2d 18, 49 (Md. Ct. Spec. App. 2002)). "A contract is ambiguous if, 'when read by a reasonably

4

prudent person, it is susceptible of more than one meaning.'" *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank*, 929 A.2d 932, 951 (Md. 2007) (quoting *United Servs. v. Riley*, 899 A.2d 819, 833 (Md. 2006)). If the court determines that the terms of a contract are ambiguous, "'the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract.'" *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 547 (Md. 2003) (quoting *County Commissioners v. St. Charles*, 784 A.2d 545, 556 (Md. 2001). "If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable." *Kantsevoy v. LumenR LLC*, 301 F. Supp. 3d 577, 594 (D. Md. 2018). However, "courts do not favor the destruction of contracts because of uncertainty." *L & L Corp. v. Ammendale Normal Inst.*, 236 A.2d 734, 737 (Md. 1968).

The Court will consider each of SCI's claims for breach of contract in turn.

### *1. Count I: Workshare and Sourced Material*

SCI alleges that its CEO and VersaTech's CEO entered into a subsequent contract via email providing that SCI would cut its labor rates by 7% in exchange for VersaTech sourcing all material for the project through SCI and granting SCI 49% of the workshare going forward. (Compl. ¶ 19, Exh. B.) SCI alleges that it then "signed task order modifications that reduced SCI's rates by the agreed upon 7%" (*id.* ¶ 25), but VersaTech failed to give SCI 49% of the workshare or source its materials through SCI (*id.* ¶¶ 37–38). VersaTech argues in response that the email exchange is not a contract, but rather at most an "agreement to agree," which contemplates a further written agreement and contains indefinite material terms. (Mot. Dismiss Mem. at 12–15.) VersaTech also argues that the original contract requires any modifications to be signed by VersaTech's contracts representative, Vivian Bert, and that she did not approve this alleged modification. (*Id.* at 11–12, citing Exh. A § 11.)

First, as to the argument that the original contract requires any modification to be signed by Ms. Bert, this requirement is not dispositive regarding the existence of a subsequent contract. "[U]nder Maryland law, contractual limitations on future modifications are not effective to prevent parties from entering into new agreements orally or by performance; rather, they only provide context for interpreting subsequent conduct." *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 88 (4th Cir. 2016). Therefore, VersaTech's argument that the subcontract could not be altered without Ms. Bert's signature is unavailing.

Formation of a contract requires mutual assent, which consists of "(1) intent to be bound, and (2) definiteness of terms." *Cochran*, 919 A.2d at 708. The language of the agreement is the "most important" factor to consider when evaluating intent. *Id.* at 709. Parties entering a contract "'must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean.'" *Mogavero v. Silverstein*, 790 A.2d 43, 50 (Md. Ct. Spec. App. 2002) (quoting *Robinson v. Gardiner*, 76 A.2d 354, 356 (Md. 1950)). In the email exchange at issue here, Mr. Singhal states, "We will do a contract mod with revised labor pricing and this work share for our managers to implement." (Compl. Exh. B at 5.) Mr. Peay responds, "I've spoken to my team and we are good with moving forward with the plan below. Vivian will begin the process of setting up new subK's." (*Id.* Exh. B at 2.) Considering the plain meaning of the words, it appears the parties did contemplate that additional written documentation would be produced.

However, the parties dispute the meaning of the term "subK's." SCI claims the term refers to additional task orders (Opp'n Mot. Dismiss at 9), which were subsequently issued reflecting the new labor rate (Compl. ¶ 25). VersaTech alleges the term refers to a modification to the subcontract, which requires Vivian Bert's signature under the terms of the subcontract. (Mot. Dismiss Mem. at 12, 14.) As used in the email exchange, the term appears ambiguous to the Court.

6

Though the term "subK's" is written in the possessive, the context of the sentence suggests Mr. Peay intended the term to be plural. If Mr. Peay was referring to a single modification to the existing contract, it is unclear why the term would be plural. SCI subsequently signed modified task orders reflecting the 7% labor rate reduction, and VersaTech paid SCI the new rates. Viewed in a light most favorable to SCI, it is plausible that the additional documentation the parties were referring to were modified task orders.

VersaTech also argues that several material terms in the email exchange are indefinite, including "the extent to which the exchange modifies Section 2.1 of the Contract outlining the factors determining the subcontractor's work allocation," "the method of frequency for calculating the parties' work allocation percentages proposed," "how the parties would implement rebalancing service support . . . ," and "how material costs will be determined." (Mot. Dismiss Mem. at 13–14.) While there may have been additional details that the needed to be ironed out between SCI and VersaTech, it is clear the parties contemplated a 7% reduction in labor rates in exchange for sourcing materials through SCI and granting SCI 49% of the workshare, regardless of how this was implemented. The fact that VersaTech agreed to the 7% reduction in labor rates in the modified task orders suggests that VersaTech understood those task orders to effectuate their new contract. Therefore, viewing the facts in a light most favorable to SCI, the Court does not find the agreement "'so vague and indefinite that it is not possible to collect from it the intention of the parties.'" *Mogavero*, 790 A.2d at 50 (quoting *Robinson*, 76 A.2d at 356).

Even if the email exchange itself did not constitute a binding contract, VersaTech's acceptance of SCI's 7% reduction in labor rates could qualify as acceptance of SCI's offer. Silence can amount to acceptance of an offer when "the offeree, with a reasonable opportunity to reject offered goods or services, takes the benefit of them under circumstances which would indicate to

7

a reasonable person that they were offered with the expectation of compensation." 2 Williston on Contracts § 6:50 (4th ed.); *see Cochran*, 919 A.2d at 714 ("Silence is generally not to be considered an acceptance of an offer unless . . . the offeree has taken the benefit of the offer . . ."). In such cases, "[t]he resulting duty is not merely a duty to pay fair value, but a duty to pay or perform according to the terms of the offer." Restatement (Second) of Contracts § 69 (1981).

The Fourth Circuit addressed a similar situation in *Galloway*, 819 F.3d 79, where the appellant had attempted to lower her monthly car payments. Her lending company told her it would send her an application to sign with new terms, and the company would then review her application and tell her in writing whether her application was approved. *Galloway*, 819 F.3d at 82. Though the appellant never received written notice from the company regarding whether her application was approved, her monthly bill was lowered to almost the exact figure that was proposed in her application, and she made the new, lower payments for the next few years. *Id.* When a dispute arose about terms in the application, the appellant argued there was a "genuine factual dispute" about whether "a meeting of the minds occurred." *Id.* at 86. The court found that appellant's submission of the signed loan application did not constitute a binding contract because the lending company "retained the right to deny" her application. *Id.* at 85. However, the court found that the lending company's issuance of a lower monthly bill (which was within one dollar of the amount proposed in appellant's application) and the appellant's acceptance of that bill through payment made "the legal consequences . . . clear." *Id.* at 86. The lending company "could not reasonably be understood to be offering [appellant] the option to her lower payment amount without accepting the other new terms specified in the Amended Agreement," which appellant "had already indicated she would accept." *Id.* The court found that "making payment in the revised amount . . . and then continuing to make those payments for several years without

8

complaint can only be interpreted as [appellant's] assent to the terms of the Amended Agreement . . ." *Id.* at 87.

As in *Galloway*, VersaTech's acceptance of the 7% rate reduction could reasonably be understood as acceptance of the terms as agreed to in the parties' email exchange. VersaTech accepted the 7% reduction in labor costs, but did not fulfill its obligation to provide SCI with the corresponding 49% workshare or to source its materials through SCI, despite specifically agreeing to those terms in the email exchange with SCI. Viewing the facts in a light most favorable to SCI, the Court concludes SCI has plausibly alleged VersaTech breached their contract as set forth in the email exchange. Accordingly, VersaTech's motion to dismiss Claim I will be denied.

### 2. *Count III: Unreasonable Failure to Approve of Second–tier Subcontractor*

SCI alleges that VersaTech breached their subcontract because VersaTech unreasonably withheld approval of SCI's subcontractor, Vision. Pursuant to § 22.2, SCI "shall not subcontract or assign this Agreement, or otherwise dispose of any of its right, title, or interest herein to any third-party, without obtaining the prior written consent of VersaTech, which will not be unreasonably withheld . . ." (Compl. Exh. A.). The subcontract further specifies that any "notice" required by the contract must be addressed to VersaTech with attention to President/ CEO Jason Peay. (*Id.* Exh. A § 22.1.)

VersaTech responds that there can be no breach because the subcontract requires SCI to receive prior written approval for subcontractors and SCI did not obtain this approval for Vision. "It is well established that a material breach by one party to a contract excuses the other party from performance." *Final Analysis Commc'n Servs., Inc. v. Gen. Dynamics Corp.*, 253 F. App'x 307, 313 (4th Cir. 2007). SCI does not allege that it sought prior written consent to employ Vision as a subcontractor, nor does SCI claim written consent was not required. However, SCI alleges that

VersaTech was aware Vision was acting as a subcontractor. In support of this, SCI points to a December 29, 2017 email from Lee Jones, a VersaTech program manager, which demonstrates Mr. Jones knew SCI was using Vision as a subcontractor. (Compl. Ex. D.)

The parties to a contract may modify that contract through their subsequent conduct, *Richard F. Kline, Inc. v. Shook Excavating & Hauling, Inc.*, 885 A.2d 381, 390 (Md. Ct. Spec. App. 2005), but SCI presents no facts to suggest that the "prior written consent" provision was altered while the "unreasonably withheld" provision was not. Either SCI and VersaTech agreed through their subsequent conduct to waive the requirements of § 22.2, in which case VersaTech would no longer be prevented from "unreasonably" withholding prior written consent, or § 22.2 is still in force, and SCI failed to gain prior written consent before using Vision as a subcontractor. The Court need not determine which of these situations occurred because in either case SCI would be unable to demonstrate VersaTech breached this section of the subcontract. Accordingly, the Court grants VersaTech's motion to dismiss Claim III.

### 3. *Count IV: Unpaid Invoices*

SCI also alleges VersaTech breached the subcontract by failing to pay SCI within the timeframe mandated by the subcontract. The subcontract requires that VersaTech pay SCI "within seven (7) days after VersaTech receives payment for such services performed by [SCI] from the Customer pursuant to the Contract or within sixty (60) days after submission of a valid invoice, whichever is earlier." (Compl. Exh. A § 2.3.) Failure to pay SCI on time constitutes a material breach of the agreement. (*Id.*)

SCI alleges at least $90,850.00 was overdue when it filed the Complaint. (*Id.* ¶ 39.) An additional $361,292.74 was outstanding, but because the invoices for those services had not been pending for 60 days and SCI did not know whether the Government had paid VersaTech for those

10

services, SCI was unable to say whether those payments were also overdue. (Opp'n Mot. Dismiss at 16–18.) VersaTech paid SCI the overdue $90,850.00 the day before filing its motion to dismiss. (*Id.* at 17 n.2.) SCI claims VersaTech is still liable for pre-judgment interest on that amount and is potentially liable for whatever portion of the outstanding $361,292.74 is overdue.

Regarding SCI's claim for the $361,292.74 outstanding, SCI's only support for the claim these payments are overdue is that VersaTech has "consistently" been late paying SCI since SCI rejected VersaTech's offer to purchase its assets. (*Id.* ¶¶ 39–40.) SCI alleges, "[o]n information and belief, VersaTech has intentionally delayed payment on SCI's invoices, based on false pretexts, for the purpose of gaining leverage over SCI by disrupting SCI's cash flow." (*Id.* ¶ 40.) SCI offers no facts suggesting that the Government has paid VersaTech for these specific invoices and that VersaTech waited longer than seven days after receiving payment to pay SCI. Nor has SCI alleged the invoices have been pending for sixty days. SCI has failed to allege sufficient facts to support its contention that some amount of $361,292.74 is overdue and accordingly has failed to "nudge[]" its "claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570. Accordingly, the Court will dismiss SCI's breach of contract claim for the $361,292.74 in outstanding invoices.

SCI's remaining claim is for prejudgment interest on the overdue $90,850.00. "[P]rejudgment interest is allowed as a matter of right when 'the obligation to pay and the amount due [have] become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date.'" *Baltimore County. v. Aecom Servs., Inc.*, 28 A.3d 11, 37 (Md. Ct. Spec. App. 2011) (quoting *Buxton v. Buxton*, 770 A.2d 152, 165 (Md. 2001)). SCI states its invoices for $90,850.00 were outstanding for over 60 days, in contravention of the requirements of the

11

subcontract. In its Complaint, SCI specifically requests "[p]rejudgment interest on all amounts, specifically including all prior invoices that VersaTech paid after the payment due date had elapsed." (Compl. at 13.) Because SCI has sufficiently alleged breach of a contractual obligation and resulting damages regarding the overdue $90,850.00, the Court will deny VersaTech's motion to dismiss this claim.[2]

### B. *Promissory Estoppel (Count II)*

SCI also brings a claim for promissory estoppel. Under Maryland law, promissory estoppel, or detrimental reliance, requires: (1) "a clear and definite promise"; (2) "where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promise"; (3) "which does induce actual and reasonable action or forbearance by the promise; and" (4) "causes a detriment which can only be avoided by the enforcement of the promise." *Pavel Enters. v. A.S. Johnson Co.*, 674 A.2d 521, 523, 532 (Md. 1996). "A clear and definite promise . . . is one that reasonably defines the contours of the action or forbearance." *McKenzie v. Comcast Cable Commc'ns, Inc.*, 393 F. Supp. 2d 362, 373 (D. Md. 2005) (citing Restatement (Second) of Contracts § 90 (1981)).

As explained above, VersaTech explicitly accepted SCI's offer to reduce its labor rates in exchange for granting SCI a 49% workshare and sourcing material through SCI. Regardless of whether or not the email exchange constituted a binding contract, VersaTech's subsequent

---

[2] SCI argues VersaTech conceded that SCI stated a claim for the overdue $90,850.00, failed to answer this count, and thus "arguably . . . forfeited its opportunity to answer the allegations in Count 4," citing to *Gerlach v. Michigan Bell Tel. Co.*, 448 F. Supp. 1168, 1174 (E.D. Mich. 1978). (Opp'n Mot. Dismiss at 16 n.1.) The Court declines to read VersaTech's statement that SCI "at best stated a claim for $90,850.00" as a concession that SCI's claim for $90,850.00 is valid. (*See* Mot. Dismiss Mem. at 20–21.) Regardless, the Court declines to follow what SCI admits is the "minority view" espoused by *Gerlach* and instead follows the majority view that a partial motion to dismiss stays the time to file a responsive pleading. *See, e.g., Saman v. LBDP, Inc.*, Civ. No. DKC 12-1083, 2012 WL 5463031, at *4 n.1 (D. Md. Nov. 7, 2012) ("'Since the issuance of the *Gerlach* decision, no court has relied on its reasoning or followed its rulings.'") (quoting *Tingley Systems, Inc. v. CSC Consulting, Inc.*, 152 F. Supp. 2d 95, 122 (D. Mass. 2001)).

acceptance of SCI's reduced labor rates and payment of those rates could be seen as a "clear and definite promise," *Pavel Enters.*, 674 A.2d at 523, to grant SCI a 49% workshare and source materials through SCI as previously agreed. VersaTech argues that SCI's reliance on the email exchange was not reasonable because for two "sophisticated business entities with millions of dollars in revenue, it is unfathomable that [SCI] and VersaTech would have entered into a substantial modification of their 19 page Contract in a few emails, especially when those emails require future documents to be drafted and reviewed." (Mot. Dismiss Mem. at 16.) Despite VersaTech's characterization of the email exchange, the email from Mr. Singhal with the proposed terms contained several pages with details. In addition, the parties were not altering the entire 19-page contract; rather, they were altering the labor rates, the workshare allocation, and how VersaTech would source its materials. As explained above, it is plausible that the future documents referred to in the emails were references to task orders, which were subsequently issued. VersaTech's argument that an email exchange between two CEOs could not alter a portion of a contract and invoke reasonable reliance in this case is therefore unpersuasive.[3]

VersaTech does not challenge the remaining elements of SCI's claim for promissory estoppel. Accordingly, the Court denies VersaTech's motion to dismiss this claim.[4]

### C. Damages

Lastly, VersaTech argues that SCI is not entitled to recover lost profits or seek disgorgement of damages. (Mot. Dismiss Mem. at 23–25.) Pursuant to § 16.3 of the subcontract,

---

[3] For the same reasons, the Court does not find that the email exchange is unenforceable because it involves a multimillion dollar deal. (*See* Mot. Dismiss Mem. at 14.) The email exchange was in writing, contained detailed terms, related back to an existing subcontract, resulted in updated task orders, and involved the parties' CEOs. Considering the facts in a light most favorable to SCI, it is plausible that SCI and VersaTech created a contract through this exchange.

[4] SCI "may not recover under both contract and quasi-contract theories," but "it is not barred from pleading these theories in the alternative where the existence of a contract concerning the subject matter is in dispute." *Swedish Civil*, 190 F. Supp. 2d at 792; *see* Fed R. Civ. P. 8(d).

the parties agreed not to seek "any punitive, special or consequential damages . . . relating to any matter arising out of, or relating to, this Agreement or the work performed hereunder . . ." (Compl. Exh. A.) In addition, § 15 states:

> **EXCEPT IN THE EVENT OF A PARTY'S GROSS NEGLIGENCE, BAD FAITH, FRAUD, VIOLATION OF LAW OR WILLFUL MISCONDUCT, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES INCLUDING, WITHOUT LIMITATION, LOST BUSINESS OR LOST PROFITS . . .**

(*Id.* Exh. A.). VersaTech claims that lost profits and disgorgement of profits qualify as consequential or special damages and that SCI is barred from pursuing these damages under the subcontract. (Mot. Dismiss Mem. at 24.)

Lost profits can qualify as either general or consequential damages. *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 182 (Md. 2012). General damages are "'those which may fairly and reasonably be considered as arising naturally from the breach,'" while special damages are "'those which may reasonably be supposed to have been in the contemplation of both parties at the time of making of the contract.'" *Burson v. Simard*, 35 A.3d 1154, 1159 (Md. 2012) (quoting *Addressograph–Multigraph Corp. v. Zink*, 329 A.2d 28, 34 (Md. 1974)). When a "lost profits claim is based on the value of the item promised," it is a claim for general damages. *CR-RSC Tower*, 56 A.3d at 182. "[W]hen lost profits are claimed for lost income from business operations that would have been made but for the breach, the claim is for 'consequential' or 'special' damages." *Id.*

Here, SCI's damages are the difference in value between what the email exchange contemplated and what SCI received. SCI requests the amount of money it would have received for sourcing all materials as well as providing a 49% labor workshare. (Compl. ¶¶ 37–38, 48; Opp'n Mot. Dismiss at 19.) Because this is no more than what the email exchange between SCI

14

and VersaTech specifically provided for, these damages "'aris[e] naturally from the breach'" and therefore qualify as general damages. *Burson*, 35 A.3d at 1159 (quoting *Zink*, 329 A.2d at 34). Accordingly, VersaTech's claim that SCI is barred from the subcontract from seeking lost profits is denied.

Disgorgement of profits "is not considered an award of damages," *S.E.C. v. Lawbaugh*, 359 F. Supp. 2d 418, 423 n.2 (D. Md. 2005), but rather is considered an award for restitution, *Consumer Prot. Div. v. Morgan*, 874 A.2d 919, 944 (Md. 2005).[5] "'[I]t is simply a rule of law that requires restitution to the plaintiff of something that came into defendant's hands but belongs to the plaintiff in some sense.'" *Bank of Am. Corp. v. Gibbons*, 918 A.2d 565, 571 (Md. Ct. Spec. App. 2007) (quoting *Mass Transit Admin. v. Granite Constr. Co.*, 471 A.2d 1121, 1125 (Md. 1984)). Accordingly, §§ 16 and 15 of the subcontract do not bar SCI from seeking disgorgement of profits. The Court therefore declines to dismiss SCI's request for disgorgement of profits.[6]

## IV. Conclusion

For the foregoing reasons, an Order shall enter granting in part and denying in part the VersaTech's motion to dismiss. (ECF No. 12.) The motion to dismiss will be granted as to all claims under Count III and claims in Count IV concerning the outstanding $361,292.74. The motion to dismiss is otherwise denied.

DATED this 27 day of August, 2019.

---

[5] SCI does not request an award of both restitution and damages, but rather pleads both in the alternative. (Opp'n Mot. Dismiss at 20 n.4.)
[6] Because the Court has determined that SCI seeks only general damages or restitution, the Court need not address whether SCI sufficiently alleged that VersaTech acted willfully or in bad faith.

15

BY THE COURT:

James K. Bredar
Chief Judge